IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

_____
)
*Ex Parte* Application of NOVEXCO )
(CYPRUS) LIMITED, NMLK )
PENNSYLVANIA CORP. and )
GENERALI ITALIA, S.P.A. for an ) CIVIL ACTION NO.
Order Pursuant to 28 U.S.C. § 1782 to )
Conduct Discovery for Use in a )
Foreign Proceeding )
_____

## UNSWORN DECLARATION OF MICHAEL O'SULLIVAN
## PURSUANT TO 28 U.S.C. §1746

1. My name is Michael O'Sullivan, and I am a person of the full age of majority and a citizen and resident of the United States of America and the State of Maryland.

2. I have personal knowledge of the matters declared herein.

3. I am a subcontracted Engineer Surveyor employed exclusively by Atlantic Marine Associates, Inc. - Consulting Services (24 Whitehall Street – 31st Floor New York, NY 10004) as an Engineer Surveyor specializing in marine surveying, consultancy, claims management, adjusting and advisory services with regard to maritime and shipping casualties and claims on a global basis.

4. In addition, I served at sea for twenty-nine years on oceangoing vessels as a United States Coast Guard licensed Marine Engineer, including ten years as Chief Engineer, and in this regard am familiar with standard engine room procedures for oceangoing vessels as well as generally accepted best practices for engine room/vessel engineering record keeping.

5. I have been retained by Novexco (Cyprus) Limited ("Novexco"), NLMK Pennsylvania Corp. ("NLMK") and Generali Italia, S.p.A. ("Generali") in this matter

1

EXHIBIT J

to assist with their discovery efforts to obtain relevant shipboard documentation from the M/V FRATZESCOS, as well as crew deposition testimony, pertinent to an underlying general average dispute regarding issues with the M/V FRATZESCOS's stern tube assembly, reported on or about December 20, 2014.

6. In this capacity, I attended aboard the M/V FRATZESCOS in Gloucester City, New Jersey, on March 28, 2015 to oversee the collection of certain documents (i.e. the engine alarm printouts and daily alarm printouts) from the vessel further to the subpoena issued by the District Court for the Federal District of New Jersey on March 26, 2015.

7. Likewise, after production of the documents from the M/V FRATZESCOS, I assisted in review of those documents with respect to interpreting technical aspects of the various documentation, and verifying the completeness of the production.

**NON-PRODUCTION OF STERN TUBE OIL ANALYSES**

8. No stern tube oil analysis reports were produced from the M/V FRATZESCOS, as required at item 4 of the subpoena, except for a post-casualty stern tube lube oil sample, which was drawn and landed while the vessel lay at anchor in Malta after the December 20, 2014 general average incident.

9. In my experience, periodic (at least quarterly) stern tube oil analyses are conducted on oceangoing vessels as a necessary means of properly monitoring the condition of the stern tube assembly and to ensure the integrity of the components.

10. In particular, the stern tube lube oil must be intermittently tested for, *inter alia*, the presence of sodium and water, which would indicate incursion of sea water into the assembly (and potentially environmentally problematic leakage of oil from the

assembly into the sea); and various wear metal elements (such as tin, lead, aluminum and copper), which would indicate breakdown of the metal in the stern tube bearings due to lack of proper lubrication that may be caused by water ingress past the stern seal and into the stern tube lube oil tank or mechanical issues associated with stern tube bearing lubrication equipment.

11. Moreover, reports indicating the results of these periodic stern tube lube oil analyses are generally, and necessarily as a practical matter, forwarded to the vessel from the ship managers' shoreside technical department where these reports are reviewed, and maintained onboard the vessel allowing the vessel's engineers to take corrective action, if possible, and monitor the abnormalities and trend changes of the stern tube lube oil over time to determine whether a problem exists.

12. The absence of stern tube oil analysis reports on the M/V FRATZESCOS (assuming none were aboard based on the fact that none were produced except from the post casualty lube oil sample drawn and landed in Malta after the December 20, 2014 general average incident), would be highly abnormal, given standard best practices for stern tube lube oil monitoring, and would in my opinion render the vessel unseaworthy insofar as the absence of these lube oil analyses would prevent the vessel's engineers from being able to properly monitor the stern tube assembly for potential problems or attempt to effect corrective action.

13. Moreover, email correspondence of November 18, 2014 from the M/V FRATZESCOS' manager to the vessel indicates that a stern tube lube oil sample was requested from the vessel for testing; yet, no documentation of this report has been produced.

14. In the event stern tube oil analysis records were aboard the M/V FRATZESCOS on March 28, 2015 during the vessel's Gloucester City, New Jersey port call when I attended aboard the vessel to oversee document production, which I could not verify insofar as I was allowed only limited escorted access to the engine room and no access to spaces where subpoenaed documents were being collected and organized, those stern tube oil analysis records have not been produced as called for in the subpoena.

15. Any stern tube lube oil analyses for the M/V FRATZESCOS in the six months prior to December 2014 are critically important as a factual matter to the general average dispute between the vessel's owners and Novexco, NLMK and Generali.

16. In particular, the stern lube oil analysis from the sample requested by the Technical Department of the ship managers on November 18, 2014 is particularly critical, as this sample was landed from the vessel almost a month to the day prior to the general average incident on or about December 20, 2014, and would give the best information (based on my current appreciation of the relevant documents) regarding the condition of the stern tube lube oil, and, thus the stern tube assembly as a whole, prior to the general average incident.

**ISSUES WITH ENGINE ROOM LOGS**

17. In addition to the problematic issue of the absent stern tube lube oil analyses reports, the documents produced in response to items 1 and 2 of the subpoena (generally requesting all vessel and engine logs, both "smooth," i.e. the final entries recorded in the official vessel log books, and "rough," i.e. handwritten drafts of entries that may have been kept by the crew prior to entry in the formal log books along with the

rough daily maintenance/repair log, typically maintained by the 2nd Engineer) raise significant concerns.

18. First, the "smooth" engine room logs, are extremely sparse, and do not include the type of information that is generally kept in such logs as a general practice of good shipboard engineering practices.

19. Likewise, in reviewing the alarm log printouts, which indicate the time of the occurrence of all engine alarms (including alarms from the stern tube assembly) as well as the time of the clearance of the alarm, there were numerous stern tube assembly alarms - including low pump pressure and low oil tank level alarms - for the stern tube assembly on November 18, 19 and 20 2014; as well as throughout the day a week earlier on November 10, 2014.

20. Despite these numerous alarms, there are no entries at all in the "smooth" engine room logs regarding any response to these numerous alarms; the log book section providing space to include "remarks regarding operation troubles" is completely blank on all of these dates, and (generally speaking) throughout the remainder of the "smooth" logs as a whole.

21. Moreover, on November 29, 2014 (roughly three weeks prior to the general average incident), the vessel received 10 drums of Bio Neptan 100 stern tube oil (a biodegradable, eco-friendly oil).  The delivery of this stern tube oil to the vessel would normally be noted in the engine room logbook or in the 2nd Engineers daily work log; however, again, there are no remarks in the "smooth" engine logs regarding why this large amount of additional stern tube oil was required (there is an entry in the engine room log book on December 5 - 6, 2014 indicating the Bio Neptan 100

stern tube oil was necessary to comply with USCG requirements, but based on a receipt produced for stern tube lube oil delivered to the vessel on June 27, 2014 while the ship was in the shipyard at Dalian, Yanti, China, the oil already in the stern tube appears to have been in compliance with USCG requirements).

22. Based on my experience, the absence of any remarks or entries relative to the various stern tube alarms in the month before the general average incident and the delivery of the Bio Neptan 100 oil, and the general sparseness of the "smooth" engine room logs, is inconsistent with standard shipboard practices of log keeping.

23. Moreover, given the numerous alarms and delivery of the large amount of Bio Neptan 100 on or about December 1, 2014, I would have expected more detailed and numerous entries in the engine logs regarding these issues with the stern tube assembly.

24. Furthermore, it is standard practice for the chief and second engineer aboard vessels like the M/V FRATZESCOS to maintain handwritten notes/logs (often in pocket-sized notebooks or notepads) during the course of their workday. Among these notes would be the entries that are later entered into the formal "smooth" engine room logbook along with the maintenance and repair log maintained by the 2nd Engineer.

25. No such handwritten notes or draft entries were produced from the vessel (notwithstanding that these documents were specifically requested in items 1 and 2 of the subpoena).

26. Assuming based on the lack of production that there were no such handwritten documents aboard the vessel, this would be highly unusual and not consistent with

6

best practices for engine crews aboard oceangoing vessels like the M/V FRATZESCOS.

27. Based on the above, and my experience serving as a licensed Marine Engineer on oceangoing vessels similar to the M/V FRATZESCOS, I believe that not all documents responsive to the subpoena that were (or should have been) aboard the vessel were produced in the March 28, 2015 document collection.

28. I declare under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing facts are true and correct to the best of my knowledge, information and belief.

*michael H. O'Sullivan*

_____

Michael H. O'Sullivan,

Executed on this 13th day of April, 2015.

7